[No. 6565.]

## SCHWARTZ v. THE PEOPLE.

1. **Intoxicating Liquors — Right to Traffic In —** It is settled doctrine that the right to sell intoxicating liquors depends upon strict compliance of the vendor with the requirements of the laws in force in the community where the sale is proposed. No absolute right to engage in the traffic has ever been admitted in

this state. It is and always has been a mere privilege, exercised under a license granted by public authority.—(248-250)

2. **Construction—Exclusion Implied from Expression** — The maxim that the expression of one thing is the exclusion of another is not a fixed and unalterable rule applicable in every case, nor is it in high favor in the construction of the fundamental law.—(252)

3. **Constitutional Law— Construction of the Constitution—** In ascertaining the meaning of the words used in the constitution, recourse may be had to the proceedings of the constitutional convention, of which the court will take judicial notice, the policy of the territory as manifested in its legislation, the attitude of the members .of the convention with reference to such legislation, as shown in the proceedings of that body, and the common understanding of official, professional and other persons as manifested in the legislation of the state and the expressions of the judiciary.—(257)

4. **Legislative Power — Implied Limitations** — The broad power of legislation reposed in the general assembly by sec. 1, art. V, of the constitution, is not to be limited by implication drawn from any other provision of that instrument, unless such implication is a necessary one.—(270)

5. **Local Option Laws—Constitutionality—**The general assembly, by sec. 1 of art. V of the constitution, has absolute power to regulate or prohibit the manufacture or sale of intoxicating liquors, and this power is not limited or impaired by anything contained in sec. 5 of art. XVIII.—(268)

6. **Local Option Law—Construction—**Under secs. 1, 7, of the act of March 25, 1907 (Laws 1907, 495), where a city or ward votes to become "anti-saloon territory," such an expression of the majority is effective throughout the whole extent of the political subdivision, though the majority of the electors of some lesser subdivision of the same city or ward, at the same election, declare themselves opposed to the proposition. Contrariwise, if the majority of the electors of a precinct vote in favor of becoming anti-saloon territory, this will become the law of that precinct, though the ward as a whole vote against the proposition. There may be a dry precinct in a wet ward or town or city, but no wet precinct in a dry ward.—(278-280)

Where once any subdivision becomes anti-saloon territory, the original status can be restored only by a favorable vote in the identical territory. No vote of reversal in any other subdivision, whether greater or smaller, can affect the status of anti-saloon territory once established.—(280-281)

The limitation upon a resubmission of the question contained in sec. 9 of the act, applies only where the proposition is submitted in the identical district in and for which the former vote was taken.—(281)

Each of the several political divisions enumerated in the statute controls the traffic within its own limits. Each may declare exclusively and conclusively that prohibition shall prevail, but not that it shall not prevail. If the precinct votes in favor of prohibition, a majority of the ward may not undo this result. If the precinct votes against prohibition, the majority of the ward may reverse this result.—(281-282)

*Error to the Denver District Court*—Hon. GEO. W. ALLEN, Judge.

Mr. ERNEST MORRIS, Messrs. DIXON & DIXON, and Mr. JOHN M. WALDRON, for plaintiff in error.

Hon. W. H. DICKSON, attorney general; Mr. GEO. D. TALBOT, assistant attorney general; Hon. JOHN T. BARNETT, attorney general; Mr. JAMES BRINSON, assistant attorney general; Mr. HALSTED L. RITTER, and Mr. EDWARD P. COSTIGAN, for defendant in error.

The sixteenth general assembly passed an act known as the Local Option Law, which was duly approved March 23, 1907, and went into effect June 23d next thereafter. At the general election held in the city and county of Denver on May 19, 1908, a ward proposition was submitted, under the law, to the qualified electors of ward 12 therein, as ·to whether the ward should become anti-saloon territory, and a majority of the electors casting ballots thereon voted in the affirmative. Simultaneously with the ward submission, a separate and distinct like proposition was submitted to the electors of precinct 4 within ward 12, and a majority of the electors voting thereon declared against the question.

On June 27th following the submissions an information was filed in the court below charging the plaintiff in error with the unlawful sale of intoxica-

ting liquors within the limits of ward 12, the same being then and there anti-saloon territory, having become such by virtue of the vote upon that question above mentioned.

At the time such submissions were had the plaintiff was a duly licensed saloonkeeper in precinct 4 and continued to do business under such authority. It is on account of sales so made, after said submissions, that the information herein was lodged against him. To the information the plaintiff in error filed a special plea in which it was stated, among other things, that the same was interposed "without conceding or admitting the regularity or validity of such submissions, and without waiver of any right to question the same in any manner."

The plea further avers that, at the election referred to in the information, the qualified voters of precinct 4, in which territory the unlawful sale of liquors charged therein was made, had by a majority vote thereof determined that such precinct should *not* become anti-saloon territory.

The special plea then stated in substance that the defendant, during all of the times mentioned in the information and long prior thereto, was duly and regularly licensed pursuant to law to sell intoxicating liquors in said precinct, and that he had never sold any of such liquors outside of the limits thereof, or except as authorized by said license.

To this plea a general demurrer was interposed and sustained. Thereafter upon plea of *not guilty* the cause came on regularly for trial. No testimony was introduced, but trial was had upon an agreed statement of facts and the cause submitted to the jury thereon. The essential features of the case, as thus agreed, are as follows: That pursuant to the provisions of the local option enactment the question was submitted to the voters of ward 12 in the county,

and simultaneously to the electors of precinct 4 within ward 12, as separate and distinct propositions, whether the ward and precinct should become anti-saloon territory; that a majority of the electors of the ward voted in the affirmative, while at the same time a majority of voters in the precinct declared in the negative; that the alleged unlawful sale charged in the information occurred in the precinct; and that prior to and at the time of the alleged unlawful sale, which occurred after the election, the defendant was a duly licensed saloonkeeper in the precinct, and that his license was in full force, because precinct 4 of ward 12 had not become anti-saloon territory by virtue of the vote on the submission in the ward.

Upon these facts, the defendant moved the court for an instructed verdict of *not guilty,* which motion was denied, and in lieu thereof the court instructed the jury that ward 12 of the city and county of Denver was anti-saloon territory, throughout its entire extent, at the time the offense charged in the information was committed; a verdict of *guilty* was returned, and thereupon judgment was rendered imposing a fine of $100.00 upon the defendant, together with costs of the proceedings. Objections were taken and exceptions reserved to the ruling of the court in sustaining the demurrer to the special plea, and in refusing to direct the jury to return a verdict of *not guilty;* also to the instruction given to the jury by the court to the effect that ward 12 at the time of the commission of the alleged offense was anti-saloon territory throughout its entire extent, which was in effect a direction for a verdict of conviction; and also to the verdict and the judgment rendered thereon as being unauthorized and contrary to law.

It is to review this judgment and the various rulings of the court leading up to it, that plaintiff in error brings the case here.

Mr. JUSTICE BAILEY delivered the opinion of the court:

On this review but two propositions are presented and argued by counsel: (1) Is the so-called local option law a valid and constitutional one? (2) If yes, then when a ward proposition is submitted under it to the qualified electors thereof as to whether the ward shall become anti-saloon territory, and at the same time a separate and distinct like precinct proposition is submitted to the qualified electors of a precinct within the ward, and the ward votes *yes* and the precinct votes *no,* what is the legal effect of such vote?

The validity of the local option law seems not to have been directly challenged or passed upon in the court below, as being obnoxious to any provision of our state constitution. However since that question is now urged, and since it is fundamental, the duty of the court to meet and dispose of it seems plain, for it must be that if the law is void a conviction or sentence under it may not be upheld or enforced, and the defendant should go free. If the law upon which the prosecution is based is unconstitutional, then it is no law and there can be no offense for the supposed violation of its terms. Whenever that question is presented and urged, although it be for the first time in a court of review, if it clearly appears, upon the face of the undisputed record, to be fairly involved, manifestly it commands and deserves the consideration and judgment of the court. Especially is this so in a criminal case where the very foundation of the cause rests upon the validity of the statute, and in which alone is found the power and authority of the court to act at all, else there might appear the anomaly of a person being found guilty of an offense under, and paying the penalty for a violation of, despite a protest on

this ground, the provision of a pretended law which in fact had and has no valid existence and is not a law. The facts are agreed, the statute law upon which the case is founded is before the court, and if it appears upon its face, when read and considered in connection with the organic law of the state, to contravene the latter, it is too clear to require argument that at least no judgment of conviction based on such law should be affirmed, leaving that question undetermined, although not directly urged in or decided by the trial court. In any event, we are the more inclined to decide this question because of its great public importance; beside no point is made against its determination because not considered and passed upon below; on the contrary, both sides join in an earnest appeal to the court for a decision thereof.

By the local option law power and authority is conferred upon the qualified electors of certain specified political subdivisions of the state to determine by popular vote whether a given district or political subdivision shall become anti-saloon territory, or having by said vote become anti-saloon territory, whether it shall so remain. When a majority of the qualified voters within such district or subdivision voting on the question declare in favor of anti-saloon territory, then the statute provides that it shall be unlawful to sell intoxicating liquors at all therein, except as otherwise provided by the act. In other words, it makes such district or subdivision absolute prohibition territory and fixes penalties by way of fines and imprisonment, either or both, in the discretion of the court, against those who shall sell intoxicating liquors within its limits. The term "intoxicating liquors," as used in the act, is defined as including *any* fermented, distilled, malt, vinous or other intoxicating liquors. The entire field is broadly covered.

By the act, in most definite and specific terms, the legislature has delegated, to the qualified voters of the various subdivisions of the state therein mentioned, the power and right to decide by local vote whether the sale of *any* fermented, distilled, malt, vinous or other forms of intoxicating liquors shall thereafter be permitted within the district affected by the vote, and if the vote be in the affirmative it absolutely prohibits such sale of *any* liquors, whether *pure* or otherwise.

Counsel for plaintiff in error contend that the right has been withdrawn from the legislature by constitutional provision to directly enact any law whatsoever in prohibition of the power to sell *pure* liquors in this state, and if such right is not with the legislature, then it is equally without right or authority to delegate, as it has done by their act, to the people the power by popular vote to declare such prohibition. To the latter proposition we readily assent, for it is clear that the legislature may not lawfully do indirectly that which it is without authority to do directly.

Sec. 5 of art. XVIII of the Colorado constitution, reads as follows:

"The general assembly shall prohibit by law the importation into this state, for the purpose of sale, of any spurious, poisonous or drugged spirituous liquors, or spirituous liquors adulterated with any poisonous or deleterious substance, mixture or compound; and shall prohibit the compounding or manufacture within this state, except for chemical or mechanical purposes, of any of said liquors, whether they be denominated spirituous, vinous, malt or otherwise; and shall also prohibit the sale of any such liquors to be used as a beverage, and any violation of either of said prohibitions shall be punished by fine and imprisonment. The general assembly

shall provide by law for the condemnation and destruction of all spurious, poisonous or drugged liquors herein prohibited.''

It is contended that by the adoption of this provision there has been placed upon the legislature, by *necessary* implication, a limitation upon its powers to enact such prohibitory legislation as is found in said local option act, or any prohibitory legislation whatsoever, affecting traffic in *pure* liquors.' In other words, it is maintained that when the state constitution affirmatively directed, as it did in the section shown above, the legislature to pass laws prohibiting the ''importation into this state, for the purpose of sale, of any spurious, poisonous or drugged spirituous liquors, or spirituous liquors adulterated with any poisonous or deleterious substance, mixture or compound, that such affirmative direction was a limitation upon, and a prohibition of, the power of the general assembly to enact *any* prohibitory law relative to the sale of *pure* liquors.

On this proposition discussion has taken wide range and much has been said on various topics in a degree, we think, foreign to the precise question here for adjudgment. Argument has been indulged, as to whether there is a common-law right in the citizen to traffic in intoxicating liquors as in wheat, corn, cotton, potatoes and the like. Authorities almost without number, supposed on the one hand to affirm this right, and on the other to deny it, have been cited and quoted from. Just how this question becomes greatly important here is not readily apparent. In reference to it, however, it is sufficient to say that if the right, strictly speaking, originally prevailed at common law in the individual to traffic in intoxicating liquors, in the absence of constitutional or legislative restrictions, it no longer exists, for in all of the states, by legislative enactment, police con-

trol over their sale is to-day exercised, as a matter of public necessity and protection, because of the well-known, undeniable and indescribable evils attending their misuse, or excessive use, and that such laws, even to the extent of absolute prohibition, of both the manufacture and sale of *any* kind of intoxicating liquors, in the absence of express or necessarily implied constitutional limitation, are universally and uniformly upheld and approved as being constitutional. We affirm as a fact, generally recognized, that liquor in its very nature is an article dangerous in its use, to the morals, good order, health and safety of the people, and that it may not, at least with any show of reason, be placed on the same footing with the ordinary and necessary commodities of life. So that the doctrine is settled, for this day and generation at least, that the right of a citizen to keep a saloon and sell rum or whiskey, or any other sort of intoxicating liquor, depends solely upon a strict compliance by the vendor with the requirements of the license laws in force in the community where such sale is proposed. It follows therefore that whatever right the whiskey seller may have had at common law, it was and is in no sense such a right as might not have been, by the proper authorities, acting under valid restrictive or prohibitory laws, regulated or controlled or entirely suppressed, through the police power of the state, in the interests of good government, clean morals, and the general public welfare.

In this state there never has been, and is not now, an inherent, natural or common-law right in the citizen to sell intoxicating liquors. Indeed he has no absolute right to sell it at all. It is but a privilege he gets under a license granted. The traffic here in liquor, without a license, is unlawful, and has been so from the earliest territorial days. No citizen ever

had a common-law right in Colorado to carry on the business of dealing in intoxicating liquors. In substantial support of the foregoing we cite and quote from 137 U. S. 86, *Crowley v. Christensen,* opinion by Mr. Justice Field, as follows:.

"It is urged that, as liquors are used as a beverage, and the injury following them, if taken in excess, is voluntarily inflicted and is confined to the party offending, their sale should be without restrictions, the contention being that what a man shall drink, equally with what he shall eat, is not properly matter for legislation.

"There is in this position an assumption of a fact which does not exist, that when the liquors are taken in excess the injuries are confined to the party offending. The injury, it is true, first falls upon him in his health, which the habit undermines; in his morals, which it weakens; and in the self-abasement which it creates. But, as it leads to neglect of business and waste of property and general demoralization, it affects those who are immediately connected with and dependent upon him. By the general concurrence of opinion of every civilized and Christian community, there are few sources of crime and misery to society equal to the dram shop, where intoxicating liquors, in small quantities, to be drunk at the time, are sold indiscriminately to all parties applying. The statistics of every state show a greater amount of crime and misery attributable to the use of ardent spirits obtained at these retail liquor saloons than to any other source. The sale of such liquors in this way has heretofore been, at all times, by the courts of every state, considered as the proper subject of legislative regulation. Not only may a license be exacted from the keeper of a saloon before a glass of his liquor can be thus disposed of, but restrictions may be imposed as to the class of

persons to whom they may be sold, and the hours of the day, and the days of the week, on which the saloons may be opened. Their sale in that form may be absolutely prohibited. It is a question of public expediency and public morality, and not of federal law. The police power of the state is fully competent to regulate the business—to mitigate its evils or suppress it entirely. There is no inherent right in a citizen to thus sell intoxicating liquors by retail; it is not a privilege of a citizen of the state or of a citizen of the United States. As it is a business attended with danger to the community, it may, as already said, be entirely prohibited, or be permitted under such conditions as will limit to the utmost its evils. The manner and extent of regulation rest in the discretion of the governing authority. That authority may vest in such officers as it may deem proper the power of passing upon applications for permission to carry it on, and to issue licenses for that purpose. It is a matter of legislative will only.''

The doctrine above announced is widely approved by the courts of last resort throughout the country, and has been heretofore specifically commended by this court, *Cronin v. Adams*, 29 Colo. 488, which view is now again emphatically affirmed by the court as now constituted.

It must therefore be accepted, beyond chance of controversy, that the legislature of Colorado has the full right and power by law, to provide such ways and means to prohibit and suppress the sale of any kind of intoxicating liquors as it may see fit, and as the exigencies of the case seem to it to require and demand, unless by express constitutional inhibition, or *necessary* implication, that right and power has been withdrawn.

This brings us to a direct consideration of the effect upon the right and authority of the general as-

sembly to legislate in this behalf concerning the sale of *pure* intoxicants, in view of the affirmative direction to it to prohibit by law the importation, manufacture and sale in Colorado, contained in sec. 5 of art. XVIII of our state constitution above quoted, of spurious, poisonous, drugged spirituous liquors, or spirituous liquors adulterated with any poisonous or deleterious substance, mixture or compound, except for chemical or mechanical purposes.

Sec. 1 of art. V of the constitution says:

"The legislative power shall be vested in the general assembly, which shall consist of a senate and house of representatives, both to be elected by the people."

This is a clear and unrestricted grant of the broadest legislative powers to the general assembly. By this declaration every power capable of being delegated to the legislature in the matter of the enactment of laws is conferred upon it and includes the unlimited power to deal with the liquor traffic as it shall see fit. It may, under this delegation of power, by law, license, regulate, control, suppress and prohibit that business. Now does the enactment of this *special affirmative* provision of the constitution, with reference to a specific kind and character of liquors, to wit: such as are *spurious, poisonous, drugged, impure* or *adulterated,* and commanding the legislature to prohibit *their* importation, manufacture and sale as a beverage, strip it, by *necessary* implication, of all power to prohibit the importation, manufacture and sale, as a beverage, of *pure* liquors? There is no express prohibition of the power of the general assembly to so legislate, and if the prohibition or limitation upon the legislature, as contended, exists, it rests solely upon the implication, which is to be drawn from the aforesaid affirmative mandate as to *impure* liquors, that it negatives the existence of

legislative power to prohibit concerning any other class of liquors.

Although urged from many view points, and presented in various phases, with great ability, research and learning, and involving numerous incidental questions, the contention rests chiefly upon the application of the doctrine, to the facts of the case at bar, that a general grant of legislative authority in the constitution is limited and qualified by subsequent special affirmative provisions therein relative to a particular subject-matter. This contention is in effect an elaboration of the legal maxim that "A specification of particulars is an exclusion of generals," or "the expression of one thing is the exclusion of another." In other words, it is said that when the constitution conferred the *special* power and enjoined the *special* duty upon the legislature to prohibit the importation, manufacture and sale of *spurious* and *impure* liquors, but remained silent as to the prohibition of the importation, manufacture and sale of *pure* liquors, that such affirmative declaration must be construed as implying the negative as to the legislative power by law to prohibit traffic in the latter kind.

With reference to the rule of interpretation, which forms the ground-work, and is the very gist, of the argument of counsel for plaintiff in error, that "The expression of the one is the exclusion of the other," it may be fairly said that it is in no sense a fixed and unalterable rule, to be applied in every case where ingenious counsel may deem it applicable, and may be in need of its helpful agency to attain the end sought; neither is it in high favor as a rule of constitutional construction nor of universal application. Judge Story, in his work on the constitution, sec. 448, says of this maxim:

"It is often said that in an instrument a speci-

fication of particulars is an exclusion of generals or
the expression of one thing is the exclusion of an-
other. Lord Bacon's remark 'that as exceptions
strengthen the force of a law in cases excepted, so
enumeration weakens it in cases not enumerated,' has
been perpetually referred to as a fine illustration.
These maxims, rightly understood and rightly ap-
plied, undoubtedly furnish safe guides to assist us
in the task of exposition. But they are susceptible
of being applied, and indeed are often ingeniously
applied, to the subversion of the text and the objects
of the instrument. Thus it has been suggested that
an affirmative provision in a particular case excludes
the existence of the like provision in every other case.
Both of these deductions are, or rather may be, un-
founded in solid reasoning. Thus it was objected to
the constitution that, having provided for the trial by
jury in criminal cases, there was an implied exclu-
sion of it in civil cases. As if there was not an
essential difference between silence and abolition,
between a positive adoption of it in one class of
cases and a discretionary right (it being clearly
within the reach of the judicial powers confined to
the union) to adopt or reject it in all or any other
cases. One might with just as much propriety hold
that because congress has power 'to declare war'
but no other power is expressly given to make peace,
the latter is excluded, or that, because it is declared
that 'no bill of attainder or *ex post facto* law shall
be passed' by congress, therefore congress possesses
in all other cases the right to pass any laws. The
truth is, that, in order to ascertain how far an affirma-
tive or negative provision excludes or implies others,
one must look to the nature of the provision, the sub-
ject-matter, the objects and scope of the instrument.
These, and these only, can properly determine the
rule of construction. * * * In relation, then, to

such a subject as the constitution, the natural and obvious sense of its provisions, apart from any technical or artificial rules, is the true criterion of construction."

This court has frequently had occasion to consider and comment upon the character, nature and value of this rule in connection with the interpretation of constitutional provisions and statutory enactments. We here cite and quote from two of those cases. In *The People ex rel. Livesay v. Wright*, 6 Colo. 92, this court, speaking through Chief Justice Elbert, of and concerning this maxim, said:

"It must be remembered, however, that this maxim is not of universal application in the construction of statutes. The legislative intention is to be taken according to the necessity of the matter, and according to that which is consonant to reason and sound discretion. It is simply a rule for arriving at legislative intent, and is to discreetly guide, not despotically govern."

And again in *Orahood v. Denver*, 41 Colo. 175, this court, speaking through Mr. Justice George W. Bailey, emphasizes this view in the following announcement:

"The plaintiff in error relies somewhat upon the maxim 'The express mention of one thing implies the exclusion of another,' and urges that notwithstanding sec. 3 of art. XX terminated the right to the office, the right to the salary did not cease, because it was not properly mentioned. This maxim is not of universal application, and great caution is requisite in dealing with it lest we destroy the intention of the people in the adoption of the amendment as discoverable from the instrument itself and the circumstances of the transaction."

In commenting on this maxim, the author, at

page 674 of Potter's Dwarris on Statutes and Constitutions, says:

"Safe as such maxims are, as a general rule, it still requires skill to see that they are not applied to the subversion of the intent and object of the instrument. They are, in particular cases, susceptible of being so improperly applied, by the ingenious devices of legal advocates."

In *Ogden v. Saunders,* 12 Wheat. 214, 332, Chief Justice Marshall declared the following as a rule of interpretation, having then under consideration the federal constitution:

"To say that the intention of the instrument must prevail; that this intention must be collected from its words; that its words are to be understood in the sense in which they are generally used by those for whom the instrument was intended; that its provisions are neither to be restricted into insignificance nor extended to objects not comprehended in them, nor contemplated by its framers, is to repeat what has been already said more at large, and is all that can be necessary."

Judge Story, in his work on the constitution, already quoted from, at sec. 451 thereof, has this further to say generally in reference to the subject of interpretation:

"In the first place, then, every word employed in the constitution is to be expounded in its plain, obvious and common-sense meaning, unless the context furnished some ground to control, qualify or enlarge it. Constitutions are not designed for the metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature founded on the common business of human life, adapted to common wants,

designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common sense, and cannot be presumed to admit in them any recondite meaning or extraordinary gloss."

And in the text of Potter's Dwarris on Statutes and Constitutions, pages 143-146, inclusive, we find the following applicable tests laid down:

"It is not permitted to interpret what has no need of interpretation. When an act is expressed in clear and precise terms; when the sense is manifest and leads to nothing absurd, there can be no reason not to adopt the sense which it naturally presents. To go elsewhere in search of conjecture in order to restrain or extinguish it, is to elude it.

"The popular or received import of words furnishes the general rule for the interpretation of statutes. It is the duty of the courts so to construe statutes as to meet the mischief and advance the remedy, and not to violate fundamental principles. * * *

"Statutes should be interpreted according to the most full and obvious import of their language without resorting to subtle or forced construction for the purpose either of limiting or extending their operation. * * *

"The office of interpretation is to bring the sense out of the words used and not to bring a sense into them. * * *

"Statutes are to be interpreted with reference to the principles of the common law in force at the time of their passage, except when the statute itself or the courts have otherwise determined, and this rule is the same in courts of law as of equity.

"Whether courts are interpreting an agreement between parties, a statute or a constitution, *the thing*

*to seek is the thought which it expresses.*   To ascertain this the first resort in all cases is to the natural signification of the words employed, not the order and grammatical arrangement in which they stand. If, thus regarded, the words embody a definite meaning, which involves no absurdity and no contradiction between different parts of the same writing, then that meaning apparent upon the face of the instrument is the one which *alone* we are at liberty to say was intended to be conveyed. In such case there is no room for construction. That which the words declare is the meaning of the instrument; and neither the courts nor the legislature have the right to add or take away from that meaning.

"In the enactment of statutes the rule of interpretation is, in respect to the intention of the legislature, that where the language is explicit the courts are bound to seek for the intention in the words of the act itself, and they are not at liberty to suppose and hold that the legislature intended anything different from what their meaning imports."

Since then the law in question may only be held void on the doctrine of *necessary* implication, it becomes highly important to ascertain, if that may be done, what the framers of the constitution really had in mind, and actually intended to cover, by the enactment of this provision. Recourse may be had to the record of the proceedings of the constitutional convention itself for light upon that question. Of such record this court may take judicial notice. *The People ex rel. Seeley v. May,* 9 Colo. 81. Also the attitude of the members of that body, as shown by the record, concerning the then existing laws on that subject may be inquired into.

On January 17, 1876, Hon. George E. Pease, a member of that convention, introduced a resolution therein which reads as follows:

"Resolved, That there shall be ingrafted into the constitution of this state a section or clause in substance as follows: 'It shall be held a crime, subjecting the offender on conviction thereof to fine and imprisonment, to bring, import, manufacture, make or sell any adulterated, drugged or medicated spirituous liquors, whether denominated spirituous, vinous or malt, within this state.' "

On July 24th, next thereafter, Judge Wilbur F. Stone, also a member of the convention, offered as a substitute for said resolution the following:

"The general assembly shall have power to make all needful and prudential sanitary laws, and to regulate the importation, manufacture and sale of liquors, and to prohibit the manufacture of poisonous, adulterated and deleteriously drugged liquors, and the sale thereof within the state for a beverage, whether such liquors be denominated spirituous, vinous or malt."

The record shows that the original resolution together with the substitute offered were referred to the committee on judiciary. On February 7th following, that committee reported to the convention as follows:

"Your standing committee on judiciary, having had under consideration the resolution offered and referred to said committee, relating to the importation, manufacture and sale of poisonous liquors, have agreed to report back the following substitute and recommend its adoption."

The substitute reported back and recommended for adoption was in substance identical with sec. 5 of art. XVIII of the constitution, heretofore fully quoted. It was directed exclusively to the prohibition of spurious, poisonous or drugged spirituous liquors, or spirituous liquors adulterated with any

poisonous or deleterious substance, mixture or compound.

It is further to be noted that prior to the adoption of the constitution in 1876, it was the policy of the territory to prohibit the sale of intoxicating liquors, and such was the law, except where such sales were made under license. The territorial legislature by law licensed, regulated, controlled or entirely suppressed that traffic. No person in the territory had any right to engage in the liquor business except under license. The laws of the territory in reference to that subject were adopted and approved by the constitutional convention, and by the first legislature which assembled under the constitution, having been re-enacted in the general laws of the state of Colorado, approved by the session of the state legislature held in 1877. By the territorial law certain special charters had been granted to certain cities of the then territory, wherein power was granted under such charters to the cities,

"To license, restrain, regulate, *prohibit* and suppress tippling houses, gambling houses, bawdy houses, and other disorderly houses, and the selling and giving away of any intoxicating or malt liquors by any person within the city, except by persons duly licensed."

And in such laws it was specifically provided that,

"Every person not having a legal license to keep a saloon or grocery who shall barter, sell, exchange or otherwise dispose of for his gain or benefit any vinous, spirituous or mixed liquors in less quantities than one quart, or shall permit the same to be done on his or her premises, for his or her benefit or gain, shall forfeit and pay", etc.

In the "Address to the People of Colorado by the Framers of the Constitution," upon the submission of that instrument to the voters for their judg-

ment as to its adoption, this was declared, among other things, having direct reference to said sec. 5 of art. XVIII thereof:

"We have provided that all laws upon our statute books at the adoption of this constitution shall remain in full force and effect until altered or repealed by the legislature of this state.  *  *  *  We have prohibited under very stringent provisions the importation, manufacture and sale of all spurious or adulterated liquors."

If the contention is sound and to be upheld to the effect that this mandatory constitutional provision, in respect to the prohibition by the legislature of the importation, manufacture and sale of *impure* liquors, is a prohibition of, and limitation upon, the power of the general assembly to thus legislate in respect to *pure* liquors, then that provision marks the limit of legislative power upon the entire subject of liquors. In short, the sole authority of the legislature is to be found in and measured by this provision. We simply must, upon the authorities furnished, come to this conclusion, provided always the case is one for the application of the rule. Each case cited to support this contention is an authority for the enforcement of the rule in its full measure. If this provision, by *necessary* implication, may be said to negative the legislature's right to prohibit in this state the importation, manufacture and sale of *pure* liquors, then it goes with like directness, force and power against its authority to do anything else whatever looking to an interference with the traffic generally, either by way of license, regulation or control. And why? Because, plainly, if the whole subject-matter is treated of by this mandate, then what it specifically affirms the legislature shall do with reference to it, limits the power absolutely to the doing of that particular thing, in that particular

way, and to the doing of that only. Let counsel protest as they may, yet this conclusion is inevitable, both on principle and authority, if this be a case where the rule insisted upon may be applied at all. The very fact that it is denied that the rule goes so far as to take away the right of regulation from the legislature, not only weakens the force of, but totally destroys the argument, that it takes away the right to prohibit, and thus demonstrates the entire inapplicability of the contention to the facts in this case. We frankly admit that prohibition and regulation are two distinct and independent things. But this, by no line of reasoning, militates against, or alters, the conclusion here reached. If the whole subject-matter of intoxicating liquors is treated of in this affirmative provision, then, until the organic law be amended, the sole power of the legislature to treat of the subject-matter of intoxicating liquors is found within the limits of this provision. The legislature may do nothing upon this subject, except that which it is therein directed to do. It can't do more; it can't do less. It can simply prohibit the importation, manufacture and sale of those *impure* liquors enumerated in this provision. It did that by legislative enactment in 1887. At that time, according to the decisions cited, if they are applicable here, all legislative power respecting liquors of every sort and kind, *pure* and *impure,* was exhausted, and its right and authority in this respect is at an end.

In support of the foregoing we here quote from some of the authorities found in the briefs for plaintiff in error, which in our view go to establish, beyond cavil, that if the doctrine announced as to the inhibition of the legislature to prohibit *pure* liquors is sound, it extends to the matter of regulation as well.

In *Page v. Allen,* 58 Pa. St. 338, this was said:

"The expression of one thing in the constitution is necessarily the exclusion of things not expressed. This I regard as especially true of the constitutional provisions declaratory in their nature. The remark of Lord Bacon, 'that as exceptions strengthen the force of a general law, so enumeration weakens as to things not enumerated,' expresses a principle of common law applicable to the constitution."

In *Morris v. Wrightson*, 56 N. J. L. 201, it is said:

"In the construction of statutes it is a cardinal rule, which applies as well to constitutional provisions, that when a law is in the affirmative that a thing shall be done   *   *   *   in a certain manner, this affirmative matter contains a negative that it shall not be done   *   *   *   in any other manner, upon the maxim *'expressio unius est exclusio alterius.'* "

In *State v. Henry*, 87 Miss. 125, the court remarked:

"Another principle is that where the constitution deals with a *subject*, its words must be the *sole* boundary and sacred from the legislatures."

In the matter of *N. Y. Elevated R. Co.*, 70 N. Y. 327, that court said:

"An act of the legislature is the voice of the people speaking through their representatives. The authority of the representatives in the legislature is a delegated authority and is wholly derived from and dependent upon the constitution.   *   *   *   The constitution has already included *special* provisions relating thereto, and such *special* provisions constitute the *full authority* of the legislature."

In *Rodman v. Munson*, 13 Barb. 191, Judge Morse, speaking for the court, said:

"Where the constitution has granted powers over a *particular subject*, it is the natural, as it is the

legal inference, that it has granted *all* the power it intended should be exercised *over that subject.* It is only the application of a very general rule of interpretation to say that when the constitution expressly grants *some* power *over a subject,* it expressly grants *all* the power intended to be conferred *over the subject.*"

In *State v. Gilman,* 33 W. Va. 146, a case much relied upon in behalf of plaintiff in error to support his contention, in considering this provision of the constitution of that state, to wit: "Laws may be passed regulating or prohibiting the *sale* of intoxicating liquors within the limits of this state," the state supreme court there said:

"If the people had not made the provision above quoted a part of the constitution, the legislature would, so far as that instrument is concerned, have had plenary and unrestricted authority to deal with liquors in any manner that it chose to do. But the people, by declaring that, 'laws may be passed regulating or prohibiting the sale of intoxicating liquors,' according to the principles we have announced, imposed a restraint upon the plenary power. By granting an express authority to the legislature to regulate or prohibit the sale, there is an implied inhibition to the exercise of *any* authority in respect to that subject which is not embraced in the grant."

In *State v. Hallock,* 14 Nev. 202. that supreme court said this:

"It is true that the constitution does not expressly inhibit the power which the legislature has assumed to exercise, but an express inhibition is not necessary. The affirmation of a distinct policy upon a specific point in a state constitution implies the negation of any power in the legislature to establish a different policy."

In *Ex Parte Brown,* reported in 42 S. W. 554,

the court there had under consideration and construed this constitutional provision:

"The legislature shall, at its first session, enact a law whereby the qualified voters of any county, justice precinct, town, city or subdivision of a county, as may be designated by the county commissioners' court of such county, may, by a majority vote, determine from time to time whether the *sale* of intoxicating liquors shall be prohibited within the prescribed limits."

In the opinion of the court this was said:

"That provision (referring to the one above quoted) inhibits the *sale* only, and was evidently intended by the people to mark the limitation of power of the legislature on that subject. The people, in saying that the sale of intoxicating liquors might be prohibited, deny to the legislature the power to otherwise interfere with its use."

As has been so well and aptly said by counsel for plaintiff in error in their brief, at page 130 thereof:

"Further citation of authority is needless. If any rule of law can be said to be settled, it is that the conferring of *special* powers, and the imposing of special duties, touching a particular subject, by statutory or constitutional provisions, operates to withdraw such subject, *in toto*, from any general grant of authority, which, standing alone, might cover such special subject."

There seems therefore no middle ground in the application of the rule. It either applies not at all, or it covers the entire situation and renders the legislature helpless to do anything on the subject, except to prohibit *impure* liquors, and, if as contended, this provision has to do with the entire subject-matter of liquors, then under these authorities, and countless others equally forcible, some of them found in the briefs of the plaintiff in error and others elsewhere,

it follows conclusively that there is no more power or authority of the legislature of this state to *regulate* or *license* this. traffic than there is to *prohibit* it.

It will thus be seen that to so held would be in effect to say that this provision withdraws from the legislature all power with reference to liquors, except that contained in this specific grant, and that with the liquor question the legislature may deal only within the limits of said grant. Such conclusion would directly imply that the framers of the constitution were infamous in thus knowingly, for their knowledge is presumed, submitting such an iniquitous provision to the people for their approval, and that the people were insane to adopt it, for such would be the fact in both instances. We are scarcely warranted in reaching such conclusions, merely for the sake of injecting into the constitution a *possible* implication, but by no means a *necessary* or *exclusive* one.

Having thus shown, by his own authorities, that the contention of the plaintiff in error, if followed to its logical conclusion, leads to an absurd and impossible thing, we proceed to a consideration of the question involved, under the wise and wholesome rules laid down by Judge Story and other eminent law authorities heretofore quoted, considered in connection with the proceedings of the constitutional convention, and also certain announcements of this court on kindred subjects.

In reference to implications it may first be observed, that the limitation upon them is to be found only in the personal views and opinions of those having interest in the conclusion to be reached, and are as varied and far-reaching, upon a given matter, as the mental eccentricities and characteristics of the individuals themselves. They are confined only by the intellectual elasticity of those in search of them,

aided by boundless imagination, and the susceptibility and flexibility of the judicial mind, to which the appeal for their enforcement and recognition is made. Not every implication that the mental gymnast can conceive or imagine is to be indulged, but only necessary ones and such as arise naturally and obviously from the context. The danger in the general application of the doctrine lies in the fact that it is subject to such variety and diversity of opinion. The thing here to be determined is what did the framers of the constitution have in mind and intend when this particular provision was adopted. This is to be ascertained from the context itself if possible, giving the language employed its natural and ordinary meaning. Our view is that when this provision was enacted, the lawgivers had no thought save the prohibition of poisonous liquor. Apparently they saw an impending danger, which should be avoided by quick and efficient action, hence the affirmative direction for this specific legislation. There is nothing to indicate that the general subject of intoxicants was in mind, or that any intention to legislate concerning liquor at large was present. The convention did not do so expressly, and there is no sufficient reason to conclude it did so by implication. The provision applies so plainly to a certain character of liquor that it seems just as fair, and equally rational, to conclude, by *necessary* implication, that when the framers of our fundamental law commanded an enactment prohibiting this class of liquors, they thereby stripped the legislature of all power to prohibit the importation and sale of all other poisonous, drugged, adulterated or deleterious beverages or food stuffs. Poisonous liquor is as much an independent subject of legislation from pure liquor, as it is from adulterated or deleterious milk, or adulterated and deleterious sugar, or other food

product. Why indulge one possible implication, when, with like force and propriety, others may be just as plainly drawn? Should such doctrine be recognized and enforced to its limit, then it is manifest, from an examination of numerous others of our constitutional provisions, that the general authority of the legislature will be buried beneath a wilderness of implications, and therein lies the danger. This is especially true when considered in connection with any of the newer state constitutions, where the tendency has been so distinctively to invade the legislative province.

For instance, sec. 2 of art. XVIII of the constitution provides as follows:

"The general assembly shall have no power to authorize lotteries or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this state."

Here is an affirmative provision directing prohibitive legislation against that species of gambling carried on through means of lotteries. The subject is gambling. The legislature has no power to authorize, but is commanded to prohibit, a specific kind of gambling, therefore, because of such special affirmative direction upon the subject, all other kinds of gambling may be authorized, but no other kind or species of gambling may be prohibited. If this contention be correct, the legislative hand is tied as to the prohibition of every other species of gambling. Who will have the hardihood to declare and maintain that the mass of legislative enactments on our statute books, in suppression of almost every imaginable form of this vice, is a mess of pottage?

We hold squarely that it was neither the intent nor the purpose of the framers of the constitution, by this mandatory provision for the prohibition of poisonous and drugged liquors, to treat of the general

subject. This is a mandate upon the general assembly, imposing a duty to enact laws to carry out this provision directed against a particular kind of liquor, and at the same time, it is a limitation upon the power of the general assembly to pass other laws affecting this kind of liquor, under any guise or upon any pretence or pretext. The language is clear, plain, direct, concise and needs no interpretation. It carries with it no *necessary* implication that by its adoption the legislature was deprived of all power to prohibit, if it should see fit so to do, or in any other way deal, with pure and unadulterated intoxicants. This construction leaves the legislature free to act, under the general grant of authority, and under its police power, from time to time, as the exigencies of the case, and the needs and requirements of the people, in reference to the general subject, should be developed and disclosed. Undoubtedly such was the intent of the convention. In short, this provision says just what it means, and means just what it says; nothing more, nothing less; nothing may be added to it and nothing may be taken away. It is unthinkable, and beyond the pale of human imagination to conceive, that the convention, or the people by the adoption of its proposed constitution, did, or intended to, surrender any part, portion or parcel of the sovereign power, by police regulation, or otherwise, over this all-important subject-matter, since its proper regulation, control and even total suppression, when and where needful, has, as shown by observation and experience, so intimate and vital a bearing upon the health, morals, peace, prosperity and happiness of the people.

Authority in our own state is not lacking to support this construction. In 18 Colo. 234, this court, in answer to the following question from the house of representatives:

"Does the general assembly possess power, under the constitution of the state of Colorado, to provide for the establishment and maintenance of a kindergarten department in the *public* schools of this state, and the education therein of children of an age less than six years?"

construed sec. 2 of art. IX, of the constitution, which reads thus:

"The general assembly shall, as soon as practicable, provide for the establishment and maintenance of a thorough and uniform system of *free* public schools throughout the state, wherein all residents of the state between the ages of *six* and *twenty-one years* may be educated gratuitously. One or more public schools shall be maintained within each school district within the state, at least three months in each year; and any school district failing to have such school shall not be entitled to receive any portion of the school funds for that year." (The italics are ours.)

The question was whether this affirmative section limited the powers of the legislature to establish *free* schools for any person outside the ages of *six* and *twenty-one years*. The court applied the rule of construction as announced in *Alexander v. The People,* 7 Colo. 155, which is:

"The legislature being invested with complete power for all the purposes of civil government, and the state constitution being merely a limitation upon that power, the court will look into it, not to see if the enactment in question is authorized, but only to see if it is prohibited."

In deciding there the precise question involved here, the court said:

"Unless therefore the constitution, in express terms, or by necessary implication limits it, the legislature may exercise its sovereign power in any way

that in its judgment will best subserve the general welfare.

"Read in the light of this rule of interpretation, and the wise and liberal policy of the state in educational matters, this section is clearly mandatory and requires affirmative action on the part of the legislature to the extent and in the manner specified, and is, in no measure, prohibitory or a limitation of its powers to provide free schools for children under *six years* of age, whenever it deems it wise and beneficial so to do."

So here, read in the light of the foregoing rule of interpretation and fixed policy of both the state and territory from the beginning, to control, regulate, license and absolutely prohibit the sale of *every kind* of intoxicating liquors, when and where deemed necessary, for the common good, this provision of our constitution is clearly mandatory, and confined to *impure* liquors only, requiring affirmative action on the part of the legislature to the extent and in the manner specified, and is, in no measure, prohibitory, or a limitation of its powers to legislate upon the subject of *pure* liquors in any manner which it believes wise and beneficial.

The original resolution on this subject, which we here now quote again, was directed solely against poisonous liquors.

'The general assembly shall have power to make all needful and prudential sanitary laws, and to regulate the importation, manufacture and sale of liquors, and to prohibit the manufacture of poisonous, adulterated and deleteriously drugged liquors, and the sale thereof within the state for a beverage, whether such liquors be denominated spirituous, vinous or malt."

By this proposed substitute, it was specifically undertaken to authorize the regulation of *pure* li-

quors, and also to specifically prohibit *impure* ones, which substitute, if it had been adopted, would have afforded abundant support for the contention of plaintiff in error.   But the substitute was rejected, supposedly after due consideration, and the provision as it finally appears was adopted.   From this history of the convention proceedings it may be readily believed that the framers of the organic law of the state neither desired nor intended, for the opportunity was clearly presented and declined, to in any way, either looking to its regulation or prohibition, directly or impliedly, touch upon the subject of *pure* liquors, or attempt to interfere with the general power of the legislature to act in the future with reference to this subject as it might see fit.   This conclusion, from the record as preserved of the proceedings of the convention, seems a demonstration.

"The Address to the People of Colorado by the Framers of the Constitution," referring directly to this subject, contained this:

"We have prohibited under various stringent provisions, the importation, manufacture and sale of all *spurious* or *adulterated* liquors."

Thus far those proceedings appear candid and open.   Is it possible that the framers of our constitution, knowing the effect of this provision, yet resorting to concealment, submitted the result of their work in the address above referred to, to the people for their approval or rejection, without a hint of the implied complete surrender, therein insidiously lurking, of this essential legislative power?   No normal mind can or does believe that anything of the sort was intended or done.   The convention was made up of the best brain and fiber of the young territory; men of the highest motives and of the best purposes and attainments, in every walk of life.   They not only did not attempt to mislead the people, but they

themselves never meant by that provision to take from them one jot or tittle of the sovereign power contained in the general grant to the legislature, and which, through the power of police regulation, is vested in it, whether expressly reserved or not in the constitution, to deal with that general subject after a manner and fashion, as to it should appear best calculated to safeguard the public interest in the matter of morals, health, education, business and good order.

Beside, for thirty-two years or more, in each branch of government, executive, legislative and judicial, the sovereign right of the people to deal with this subject at will, through their legislative representatives, without doubt or question, even to the extent of prohibition, where deemed expedient, has been recognized and affirmatively declared. When suddenly, as if by some overwhelming necessity, for the first time in this long period, it is detected by acute and vigilant legal talent, that the right was assigned away by the organic law of the state, through the indirect, and ofttimes unsatisfactory and doubtful, route of implication. Not being impressed with the value of the revelation, we are unable to accord it the importance claimed, for neither in fact nor law does it seem possessed of those elements of genuineness which should attach to so extraordinary a discovery. While it may be true that contemporaneous legislative construction, and affirmative judicial ascertainment, when the latter is had, without the exact point decided being before the court, may not be conclusive, yet extending as they both do here over a generation, they must be persuasive, as showing the attitude of our entire people, official, professional and lay, touching the exact meaning of the provision now under consideration. The ordinary and common sense one seems to have been, during the

whole life of the state, and until now, universally adopted.

In *Mayor v. Shattuck*, 19 Colo. 104, this court, speaking through Mr. Justice Elliott, said:

"In this state the policy of our legislation has been to invest local municipal governments with large powers in respect to the traffic in intoxicating liquors. And the different towns and cities have resorted to high license, low license, local option, prohibition, or partial prohibition, as the popular will has been manifested through the local municipal officers; and so dram shops have been permitted in one part of a city or town and prohibited in another part. For example, in Denver, sometimes by charter, sometimes by ordinance, the petition or consent of a majority of the property owners within restricted limits has been made a condition to the licensing of saloons; and, again, the sale of intoxicating liquors has been forbidden within a certain distance of public schools and churches. The legality of such restrictions has never been judicially denied, so far as we are advised."

In *The People v. Raims*, 20 Colo. 489, this court said, in an opinion by Mr. Justice Campbell:

"The license is not a contract. As this court, and other courts, have often held, 'A license confers the right to do that which, without the license, would be unlawful.' *The legislature having the right absolutely to prohibit such sales as defendant was making,* has also the right to confer, and did confer, upon the county and upon the town the same power of prohibition."

This conclusion finds further direct support in the following authorities, beginning with the first official volume of the Colorado Reports: *Dietz v. City of Central,* 1 Colo. 325; *Patten v. The People,* 1 Colo. 77; *Jefferson County v. Mayr,* 31 Colo. 173;

*Keilkopf v. Denver,* 19 Colo. 325; *Adams v. Cronin,* 29 Colo. 488.

We have no controversy with much of the law cited by counsel for plaintiff in error, and relied upon to support their contention, against the constitutionality of the statute. It would serve no useful purpose to discuss and distinguish the cases in detail. Our view is that they are not applicable, under its peculiar conditions, to the case at bar. Counsel say that this provision treats of the whole subject-matter of liquors; we say the subject-matter treated of in the provision is *impure* liquors only. They argue, as we understand, from a false premise, and, of necessity, must and do reach a wrong conclusion. No other state has such a provision in its constitution nor one akin to it. There is no case in the books just like this, at least none has been produced, and we have been unable to find one. It is not claimed that any precisely in point has been cited, nor do we think one sufficiently analogous to be even persuasive, much less controlling, has been submitted.

The conclusion reached on this phase of the case might well have been rested on the authority of the *Kindergarten School decision, supra,* and other opinions of this court cited below. But because of the startling seriousness of the question involved, and the resourceful, exhaustive and vigorous manner of its presentation, we have thought it best to state our conclusions at length, with the reasons therefor.— *People v. Ames,* 24 Colo. 235; *Parsons v. The People,* 32 Colo. 325.

We are so completely possessed of the belief that the position of plaintiff in error is untenable, upon the interpretation of this constitutional provision, that we disapprove it, with neither an instant of hesitancy nor a lingering doubt.

We come now to a consideration of the second question submitted and argued, which is, "Where under our local option law, the two propositions being submitted simultaneously, the ward votes *for* anti-saloon territory, and the precinct within such ward votes *against* it, what is the legal effect of such vote?

A proper answer to this query cannot be given without careful analysis of the various sections of the act, which bear directly upon this matter, nor without a comprehensive understanding of the object and purpose of the law.

Sec. 1 of the Local Option Law is, in part, as follows:

" 'Anti-Saloon Territory' shall mean *all the territory* within the limits of any city, town, *ward,* ward-subdivision, district or *precinct* in this state, *in which,* through the action of the qualified electors therein, as provided by this act, *the keeping and sale of intoxicating liquors is prohibited,* except as provided in this act."

Sec. 2 provides, among other things, for a simultaneous submission by a ward, and by a precinct within said ward, of a proposition to become anti-saloon territory. It is conceded by both parties that such simultaneous submission is legal.

Sec. 7 reads:

"*All the territory within any political subdivision which has become 'Anti-Saloon Territory' shall continue to be 'Anti-Saloon Territory' throughout its entire extent,* notwithstanding any change which may be made in the limits of any political subdivision, until the qualified electors thereof have voted, according to the provisions of this act, to reverse the vote creating *'Anti-Saloon Territory,'* and the following section shall be construed in harmony herewith."

Sec. 8 reads in part:

"Upon filing in the office of the clerk, at least thirty days before an election in any political subdivision, of a petition directed to such clerk, containing the signatures of qualified electors residing in 'Anti-Saloon Territory,' in number not less than forty per cent. of the total vote cast therein at the last election, to submit to the qualified electors of said territory the proposition 'Shall this political subdivision (or district) reverse its vote creating "Anti-Saloon Territory"?' (provided such petition corresponds in all other respects with the petition in this act before described), such proposition shall be submitted at such election to the voters of such political subdivision or district."

Sec. 9 of the act reads as follows:

"A vote under the provisions of this act in and for any political subdivision upon the proposition 'Shall this...........become "Anti-Saloon Territory"?' or in and for any political subdivision or district upon the proposition 'Shall this............(or district) reverse its vote creating "Anti-Saloon Territory"?' shall be a bar to the submission to the voters thereof of either of such propositions, as applied to that identical subdivision or district *only,* until after a lapse of twenty-three months."

It is unnecessary, for the purpose of this opinion, to quote the statute further.

Speaking for the people as a whole, it may, at the very outset of the discussion of this branch of the case, safely be affirmed, that the traffic in intoxicating liquors is generally recognized and regarded as an undesirable and obnoxious business, one of the gravest evils of the age, a constant menace to society, not alone from a moral standpoint, but from an economic one as well, and not to be favored or encouraged. Certain it is that it has been found indis-

pensable in every state of the union, and in every civilized land, to either safeguard, control and regulate it, by effective and stringent laws for general protection, or to suppress it entirely.  Within constitutional limitations, the power is with the general assembly to surround this traffic with such restrictive legislation as it shall deem wise and necessary for the common good.  It may place around it such limitations, no matter how drastic and burdensome, as it believes, in the exercise of its discretion, the business should bear.  And it may, as we have already seen, lawfully go to the extent even of its complete prohibition.  The power is equally with the general assembly to favor by legislation, the erection and maintenance of anti-saloon territory.

Upon this point see the following authorities, which support the foregoing propositions in no uncertain terms:  *Suchwuchow v. Chicago,* 68 Ill. 449; *Mugler v. Kansas,* 123 U. S. 658; *Crowley v. Christensen,* 137 U. S. 86; *Adams v. Cronin,* 29 Colo. 48; *Cronin v. Adams,* 192 U. S. 108; *Rippey v. Texas,* 193 U. S. 510; *Trustees v. Scott,* 101 S. W. Rep. 951; *People v. McBride,* 234 Ill. 147; *Gayle v. Owen Co.,* 83 Ky. 68; *Eggen et al. v. Offutt,* 108 S. W. 334; *Tatum v. State,* 79 Ga. 178; *Ex Parte Fields,* 39 Tex. Crim. Rep. 54; *Baxter v. State,* 89 Pac. 369; *Lloyd v. Dollison,* 194 U. S. 448.

Indeed there seems no dispute that the legislature may lawfully so act, if it shall see fit.  Counsel for plaintiff in error aptly say at page 6 of their reply brief on this proposition:

"If the legislature had declared this to be the law *in express terms,* we would be compelled to bow to the sovereign power."

At the same time they deny the possibility of fairly deducing such meaning from the statute, and

earnestly deprecate the attempt of counsel for the state to place upon it such construction.

A candid and impartial study and analysis of the law, as we believe, leads to the irresistible conclusion, that this is precisely the thing which the legislature intended to do, and which it clearly, in express terms, has amply and successfully accomplished. Resort need not be had to a strained or enforced course of reasoning to reach this result. It is the natural and obvious one; it is the only one to be gathered from the context of its various sections taken as a whole. This conclusion gives force and effect to every provision of the law. No other does or can do so. The law gives to each political subdivision mentioned, small or large, a chance to bespeak for such division, anti-saloon territory, and to make of every subdivision so speaking, anti-saloon territory throughout its entire extent. The unit of sovereignty or control is determined when an affirmative vote in any politcal subdivision, or group thereof, is had, making such political subdivision, or group, anti-saloon territory, and such anti-saloon territory becomes the sovereign or controlling unit. If the ward votes dry, then it becomes anti-saloon territory throughout its entire extent, and is the sovereign or controlling unit. If the city or town votes dry, then it becomes anti-saloon territory throughout its entire extent, and is the sovereign or controlling unit. The dry precinct, the dry ward, the dry town or the dry city, controls, whichever votes to be anti-saloon territory. There can be no wet precinct in a dry ward, or town, or city, because the statute provides that when any political subdivision, which is entitled to vote on the question, declares for anti-saloon territory, it becomes so throughout its entire extent. There may be a dry precinct in either a wet ward, or town, or city, according to the result of the vote, because the statute ex-

pressly gives the right to any one or more of the enumerated political subdivisions to vote on the question, and whatever or whichever subdivision votes for anti-saloon territory, becomes such throughout its entire extent, and no territory of another or different character can exist therein.

Counsel for plaintiff in error declare in effect that it is a poor rule that don't work both ways. With the quality or character of the rule we have nothing to do. It is our province simply to ascertain what rule has been laid down, and enforce it accordingly. That one has been established in this instance that don't work both ways is beyond the shadow of doubt. That was, in its discretion, exclusively for the legislature to determine. Of its expediency it is not our function, nor have we the desire, to speak. If there has been a mistake in the passage of this enactment, and if through any misunderstanding a law has found its way upon our statute books, which the people do not desire there, the remedy is with the general assembly. It may not be applied through the medium of the judiciary.

Manifestly the purpose of the law was to afford opportunity for, and to facilitate the creation of, anti-saloon territory, and at the same time to render it difficult of destruction when once established. There could have been no purpose to give opportunity to create saloon or license territory, since, at the very inception of the law, the entire state, throughout its whole length and breath, was of that character, except in a few cities and towns where prohibition prevailed by virtue of local laws and ordinances, and which in no wise affect the object or purpose of the law under discussion. All the territory of the state, so far as affected by this law, remains license or saloon territory, except where an affirmative vote is had to take some portion out of

that class and make of it anti-saloon territory, and in whatever political subdivision, among those enumerated in the statute, of saloon or license territory, such vote be secured, whether a separate precinct, ward, town or city, it becomes anti-saloon territory throughout its entire extent. Counsel contend that to submit such question in a ward, and at the same time in a precinct within the ward, is an idle and meaningless thing. This may be true under a construction of the statute contended for by them, that the unit of control is at all times the precinct, but under the construction here given, that provision is full of meaning and of essential value to the cause which seeks to create anti-saloon territory. To illustrate, a ward and several precinct submissions within the ward may be had simultaneously; the ward may vote "no," and all of the precincts on the separate precinct submissions may vote "yes," and they thereby would become anti-saloon territory, and the balance of the ward would remain saloon or license territory. This gives opportunity to vote upon the larger unit for anti-saloon territory, and failing in that, to secure at the same time, without independent elections, favorable results in each of the smaller units.

The foregoing views are equally applicable on the proposition of reversals. When once any subdivision becomes anti-saloon territory the only way to restore it to its original status of license or saloon territory is to secure a favorable vote to that end in the *identical* territory. No vote of reversal, in any other territory, although it be in a ward including such precinct, can affect the status of anti-saloon territory once erected. For example, suppose a precinct in a given ward becomes anti-saloon territory; and then suppose immediately thereafter, and this may be done at any time without reference to the

twenty-three months limitation, because that limitation applies only to the *identical* territory in which the submission has been had, the question of creating the entire ward into anti-saloon territory is submitted and meets with defeat, such result would not affect the former declaration for anti-saloon territory in the precinct within the ward, because by the express terms of the statute no reversal of any anti-saloon declaration, except by a vote in the *identical* territory in which it was declared, may be secured.

Again suppose a precinct proposition is submitted and the vote is "no," and immediately a proposition is submitted to the entire ward to become anti-saloon territory, within which such precinct is located, and this is permissible, in spite of the twenty-three months limitation, because that distinctly is a limitation upon a resubmission in the *identical* territory in which a vote has already been had, and not to a different subdivision, and if on such vote the ward declares for anti-saloon territory, such ward thereupon becomes anti-saloon territory throughout its entire extent, covering the included precinct, because it is expressly provided that when any subdivision votes to become anti-saloon territory, it becomes *wholly* so.

In other words, the statute provides in clear and unmistakable terms, as we read it, that the several political subdivisions enumerated in the statute shall control within their own territory upon the question of prohibition, and that each shall have the privilege of saying exclusively and conclusively that prohibition shall prevail, but not that it shall not. If a precinct vote prohibition, it is not competent for any other unit to gainsay that. If a precinct votes against prohibition, it leaves such territory just as though no such vote had been taken, namely, saloon or license territory. Should the ward, town or city,

which includes such precinct, thereafter specifically
vote in favor of prohibition, which, by the express
terms of the statute, it may do, then the whole town,
city or ward thereby becomes dry. In other words,
each unit, when it votes for prohibition, whether it be
a large or small one, controls. Thus each unit
enumerated in the statute has the option of voting
prohibition in its territory, which, at the time of such
vote, was saloon or license territory, and no other
unit, large or small, may hinder such action, or abate
it when once taken.

This construction gives force and effect to every
provision of the statute and finds abundant support
in the context itself. While this purpose may not be
as directly stated, as it is in some other state statutes,
it nevertheless is stated equally conclusively. We
think its intent and effect so plainly and simply de-
clared that, when carefully and impartially read,
construction is not needed. The conclusion reached
comes without effort, in a free and natural way, from
the several provisions of the law considered together,
giving to their terms the usual and ordinary mean-
ing.

In support of the authority of the legislature to
pass precisely this character of law, and of the cor-
rectness of its interpretation as here announced, we
quote the following extracts from opinions of courts
of last resort in other states, and also of the supreme
court of the United States.

In *Rippey v. Texas, supra,* the United States
supreme court, speaking through Mr. Justice Holmes,
in upholding the Local Option Law of the state of
Texas, said:

"The state has absolute power over the subject.
It does not abridge that power by adopting the form
of reference to a local option vote. It may favor
prohibition to just such degree as it chooses, and to

that end may let in a local vote upon the subject as much or as little as it may please.''

In discussing an attack upon the constitutionality of the Illinois Local Option Law, from which our act is, in the main, taken, and with which, in every essential feature, it is identical, the supreme court of that state, in *People v. McBride, supra,* said, among other things:

''The sole question to be determined is whether the act under which plaintiff in error was prosecuted was in conflict with provisions of the constitution, and is thereby rendered null and void. The assignment of errors upon the record includes *twenty-five* grounds upon which it is alleged that the act violates the constitution, and the argument in support of the assignment of errors contains eleven main subdivisions, under which there are very numerous subheadings or specifications, covering all the gradations from important to insignificant, and from serious and substantial to shadowy and tenuous. * * *

''We have considered every argument or proposition propounded by counsel for plaintiff in error and have not found anything which renders the act void or the conviction of plaintiff in error erroneous.''

The Kentucky court of appeals, in *Trustees v. Scott, supra,* there also considering the provisions of the Local Option Law of that state, said:

''The other particular objection to the act is that it destroys the equality of the election, in that it gives more force to a vote in favor of prohibition than it does to a vote against it. All votes have precisely the same weight in the election. No one's vote counts for more than another's on that occasion. After the status is created by a majority of the votes —each vote being accorded equal potentiality in the election—the legislature has then provided that the

status of prohibition may not be subsequently altered except in a certain way; but that a status of a *failure* to prohibit may be altered earlier or *by the action of the larger unit*. This is in no sense giving one vote a different weight in the matter of the election than another's, but is merely providing for the very condition that in our opinion was contemplated by sec. 61 of the constitution. Similar provisions have been held not to infringe upon the freedom and equality of elections."

In the same case, the court said, in construing sec. 61 of the Kentucky state constitution, which reads as follows:

"The general assembly shall, by common law, provide the means whereby the sense of the people of any county, city, town, district or precinct may be taken, as to whether or not spirituous, vinous or malt liquors shall be sold, bartered or loaned therein or the sale thereof regulated.

"In this view of the situation, does the constitution mean, when it provides that the voters of any city, town, district or precinct shall determine whether or not intoxicating liquors shall be sold therein, that one unit shall dominate the others, and, if so, which one? It is certain that a county cannot be a dominant unit ever, if a town, or a city, or any precinct therein may decide the same question for itself, and contrary to the vote of the county as a whole. Nor can a town or precinct be a controlling unit if the vote of the county to the contrary can overthrow the result in the smaller territory. Constitutions, like other instruments, must be given such construction as will give some meaning, if possible, and a consistent meaning, to every word employed. We must therefore search for that meaning that will not annul the privilege accorded a precinct in this matter, nor emasculate the rights given to the coun-

ties, cities and towns.    *    *    *    Obviously, if a precinct in a town votes 'wet,' as it is called if the proposition be carried in favor of the sale of liquors, then the town is 'wet' to every intent and purpose as a town. So is the county. And as in that event any adverse vote of the town or county, by whatever majority, would be futile to affect the result of that status created by the vote of the precinct; it would be useless to take the vote except in the precinct. As this result is destructive of the autonomy of the county and of the city and town, expressly given it by sec. 61 of the constitution, it must for that reason alone, if for no other, be rejected. On the other hand to say that the larger territory shall dominate the smaller because it includes the smaller and as more consistent with the theory and form of government adopted in this state, is open to the same objection as that urged above. Whichever end of the subject might be taken under such an argument the result would lead to the destruction of the other units named in the section. There must have been some sense in which the words are used in the section under examination that will admit of all of them standing for something. There must be some condition under which it is possible to give effect to every unit made by that section, so that there might be a time when any one of them could dominate all others, should their views be in conflict. Our construction is, in view of these conditions and the language used that the constitution meant that the local units named should control within their territory the question of prohibition, that each should have the privilege of saying conclusively that prohibition should prevail, but not conclusively that it should not. This construction harmonizes the section so as to allow all of it to stand, and to give equal force and power to each unit named.''

The same court, in *Eggen v. Offutt, supra,* said in discussing sec. 2563 of the Kentucky Local Option Statute, with reference to a limitation of the time within which a resubmission might be had, and which reads as follows:

"The election or elections herein provided for shall not be held in any county, town, district or precinct oftener than once every three years.

"But we held in the case, *Trustees v. Scott,* that this statutory inhibition only applies to a second election within the time indicated in the same or identical territory. Manifestly it cannot be claimed that an election held in magisterial district number 4 as a unit, was an election in and for the county as a unit or whole, such as was the election for the county held in 1906. Therefore, the territory in which the elections occurred was not the same or identical territory. If the election of 1906 for the county, in which the county as a whole was a unit, had gone 'dry' instead of 'wet,' the election held in district number 4, the smaller unit in 1907, would have been invalidated. But inasmuch as the county election did not so result (that is did not go dry) and the precinct election resulted in favor of prohibition, and it was not held in the identical territory in which the election of the county was held, it had the effect to put prohibition in force in district number 4."

Thus it will be noted that about one year theretofore the county as a whole voted "no" upon a submission for anti-saloon territory, still an election in a precinct, being different territory from the county at large, was allowed, despite the three-year limitation provision, and a result favorable to anti-saloon territory, was permitted to stand.

In *Ex Parte Fields, supra,* the Texas court of criminal appeals, spoke as follows, in construing sec.

20 of art. XVI of the state constitution, which reads thus:

"The legislature shall, at its first session, enact a law whereby the qualified voters of any county, justice precinct, town, city or such subdivision of a county as may be designated by the commissioners' court of said county, may, by a majority vote, determine from time to time whether the sale of intoxicating liquors shall be prohibited within the prescribed limits.

"Anti-prohibition is in force in every county, justice precinct and town in this state, unless voted on at an election held for that purpose. It requires no act to put in force the right to sell intoxicating liquors. This right was not conferred upon the people of the counties, justice precincts, towns and cities by the constitution, but the right to prohibit the sale of intoxicating liquors was conferred upon the people of the county, justice precinct, town and city. Now we state this proposition: that until the legislature repeals the act enforcing this right (to prohibit the sale of intoxicating liquors) there is no power within this state to prohibit the county from declaring by an election that the sale of intoxicating liquors shall be prohibited therein. The county cannot prevent any precinct, town or city from declaring that the sale of intoxicating liquors shall be prohibited within such precinct, town, or city. There is no authority in the county to do this. On the other hand, no precinct, town or city can prevent the county from declaring that the sale of intoxicating liquors shall be prohibited within the county. * * * Let us suppose that a county election is held. A number of precincts vote against prohibition, but when all the votes are counted prohibition carries. Can it be contended that prohibition is not in force in any part of that county, notwithstanding the opposition in such

precincts? If the contention of the relator be correct, no county election should ever be held. The election should be had by precincts, cities and towns, and if all are in favor of prohibition, then prohibition would be in force in the entire county. We do not so understand the constitution. The county has the same right to declare prohibition as the precinct. *They stand exactly upon the same footing with reference to the power to declare it, but not upon the same footing with reference to the power to repeal it,* for, if a precinct can repeal it, or defeat the county election so far as that precinct is concerned, then the county has no right by an election to declare prohibition.     *     *     *,,

So in this state saloon and license territory is in force in every precinct, district, ward subdivision, ward, town and city, so far as affected by the Local Option Law, until the question is voted upon at an election for the purpose, and with the result of creating anti-saloon territory. The purpose of the act therefore is not to give opportunity to establish saloon or license territory, as that condition already prevails, but for the sole purpose of giving a chance in each subdivision mentioned, to vote anti-saloon territory.

There is abundant authority to support our conclusion as to the meaning and effect of this act, as these quotations show. No contrary decision has been found, made under like law and circumstances. The only authority cited by counsel for plaintiff in error to support their contention on this point is that of *Cole v. Commonwealth*, 101 Ky. Ct. App. 155. That decision, however, came under a statute totally unlike ours, and distinctively differing therefrom in essential particulars. It is not authority here, neither is it now applicable in that state, for it led to an amendment of the law, and finally resulted in

putting in force there a statute in effect similar to our own. The latter statute the Kentucky court of appeals considered in *Trustees v. Scott, supra,* and there denied practically every contention here made for plaintiff in error and adversely answered the queries of his counsel, now propounded. In the earlier statute there is nothing even faintly resembling the provisions of ours, making anti-saloon territory such *throughout the extent* of whatever unit, regardless of size, so votes. On the contrary, the smallest unit was there recognized as the basic one. That was the very ground upon which the court planted its decision. Here is what the court said on this point:

"The local feature of this statute is kept prominent in every part of it. *Each* subdivision, in emphatic terms, is given a right to determine for itself its local wants, and if it may not do so independently of other local preferences, it is denied a right expressly given by the language of the law."—*Cole v. Commonwealth, supra.*

By the terms of that statute, a vote in any of the designated subdivisions *against* anti-saloon territory was expressly given the same effect, under like conditions, as a vote *for* it.

In *Trustees v. Scott, supra,* later in referring to an amendment of that statute, the court had this to say:

"The legislature has now for the first time enacted a law in which it does give a controlling vote to a locality—to each of the units named—in the event it votes for prohibition, over other units mentioned which may not have voted or may have voted previously against prohibition. The question is now raised and presented for decision for the first time, whether under sec. 61 of the constitution it has the power to make such discrimination. We answer that

it has. It has it because it is not denied to it by the constitution; but on the contrary, as there must otherwise be a conflict between some of the units under certain conditions, it is by implication vested in the legislature to declare, in such event, which shall prevail. * * * At this point we may say that the act under consideration was intended to change the law as to the effect of a vote on prohibition. Under the statute that was repealed by this act (the one under which *Cole v. Commonwealth* was decided), a vote against prohibition was given the same effect as a vote in favor of it; but the present act intended to give a different effect by allowing each unit a chance—without regard to any previous vote taken in any other unit—to adopt prohibition. *So, without reference to when the vote was taken in a city or precinct, which resulted in a majority against prohibition, any other unit, either including or included by the territory just mentioned, may vote for itself on the proposition, and if it votes in favor of it, prohibition becomes effective in that territory.*"

*Cole v. Commonwealth* having been decided, as will be seen from the foregoing, under a totally different statute, is not in point.

The county was enumerated, as shown by the record of the legislature, in the original bill, as one of the political subdivisions to be affected by the Local Option Law, but was stricken before the act completed its passage. Had the precinct been intended, as the sovereign or controlling unit, what necessity existed for the elimination of the county subdivision? It may be properly assumed that the legislature understood and knew, that should the county remain in and vote to become anti-saloon territory, it would be so *throughout,* despite contrary action in any of the smaller units. No other inference can be fairly drawn. If this be correct, then is

not the like equally true of the ward, town or city?
We answer clearly so.

The statute here assailed is constitutional, the
judgment legal, in all respects proper and should be
affirmed.   It is accordingly so ordered.

Decision *en banc*.                    *Affirmed.*

Mr. JUSTICE GABBERT and Mr. JUSTICE HILL dis-
sent from the interpretation given the act.